# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| KING KULLEN GROCERY CO., INC., on behalf of itself and all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>CAL-MAINE FOODS, INC.; ROSE ACRE FARMS, INC.; VERSOVA HOLDINGS, LLC; HILLANDALE FARMS OF PA., INC.; HILLANDALE-GETTYSBURG, LLC., HILLANDALE FARMS EAST, INC; HILLANDALE FARMS, INC.; DAYBREAK FOODS, INC.; URNER BARRY PUBLICATIONS, INC. d/b/a EXPANA; EGG CLEARINGHOUSE, INC.; UNITED EGG PRODUCERS; and JOHN DOES 1-10,<br><br>*Defendants.* | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, King Kullen Grocery Co., Inc. ("Plaintiff"), on behalf of itself and all others similarly situated, upon personal knowledge as to the facts pertaining to it and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint against the above-captioned defendants Cal-Maine Foods, Inc. ("Cal-Maine"), Rose Acre Farms, Inc. ("Rose Acre"), Versova Holdings, LLC ("Versova"); Hillandale Farms, which is comprised of Hillandale Farms of Pa., Inc.; Hillandale-Gettysburg, LLC., Hillandale Farms East, Inc.; and Hillandale Farms, Inc (together "Hillandale Farms"); Daybreak Foods, Inc. ("Daybreak Foods"); Urner Barry Publications, Inc. d/b/a Expana ("Urner Barry" or "Expana"), Egg Clearinghouse, Inc. ("ECI"); United Egg Producers ("UEP"); and John Does 1-10 (together the "Defendants") for violations of federal antitrust and common laws.

## I.    NATURE OF THE ACTION

1.      This action arises from Defendants' conspiracy to fix, raise, maintain, and/or stabilize prices for conventional fresh shell eggs (referred to here as "Conventional Eggs" or simply "eggs") from at least as early as January 1, 2022, until Defendants' unlawful conduct and its anticompetitive effects cease to persist. ("Class Period").

2.      Conventional Eggs make up the majority of shell eggs sold in the United States. In 2024, Conventional Eggs held almost three-quarters of the U.S. shell egg market, followed by cage-free eggs at about 23.2 percent, and pasture-raised at less than five percent.

3.      Defendants Cal-Maine, Rose Acre, Versova, Hillandale, and Daybreak (together referred to as "Egg Producer Defendants") are the five biggest egg producers in the United States. Together they own almost half of all egg-laying commercial hens.

4.      Defendant Urner Barry is a publisher that collects, analyzes, and disseminates detailed and current information to its customers in the egg, poultry, meat, seafood, plant protein, and related segments of the food industry. Urner Barry provides actionable competitive intelligence related to the egg market to the Egg Producer Defendants and other egg producers.

5.      As part of their unlawful agreement, the Egg Producer Defendants reported inflated "assessments" of egg prices to Urner Barry. Urner Barry then published price quotes using the subjective information provided by its subscribers, including the Egg Producer Defendants. It also incorporated transaction prices from an online spot market provided by Defendant ECI—a private, members-only spot market for buying and selling eggs.

6.      The relatively small number of transactions on the ECI, combined with Defendants' large size, enabled the Egg Producer Defendants to easily influence the volume and pricing on the ECI platform, which are then incorporated into the Urner Barry quote.

7.      Urner Barry's price quotes serve as a benchmark for the pricing of Defendants' sales of Conventional Eggs.

8.      In this way, Urner Barry and ECI amplify price swings led by the largest-volume producers and prevent independent, competitive decision-making by others.

9.      Defendants' manipulation of the Urner Barry benchmark allowed them to sustain ever-increasing price hikes on their customers.

10.     Defendants have repeatedly blamed higher prices during the Class Period on Highly Pathogenic Avian Influenza H5N1 ("HPAI"), which led to the culling of millions of layer hens beginning in late 2021.

11.     In reality, however, the impact of HPAI does not account for the unprecedented surge in egg prices during the Class Period. Rather, the Egg Producer Defendants have used HPAI as a pretext to dramatically increase egg prices to the detriment of Plaintiff and the Class.

12.     Nor do input costs explain egg prices during the Class Period. Economic research shows that key inputs to egg production fell while egg prices continued to increase.

13.     Defendants were able to implement price increases and collectively raise prices because their industry is structurally susceptible to collusion. Among other things, the U.S. Conventional Egg market features a commodity product, highly concentrated and vertically integrated producers, high entry barriers, inelastic demand, and numerous opportunities to collude.

14.     Prices for conventional eggs only fell after Defendants' unlawful behavior came to light in March 2025. At that time, it was revealed that the United States Department of Justice, Antitrust Division, ("DOJ") was investigating the egg industry for price fixing. According to news reports, several defendants including Cal-Maine, Rose Acre, and Urner Barry are under

investigation. The New York Attorney General is also investigating anticompetitive conduct and high prices in the egg industry.

15.    Defendants' conspiracy has been to the detriment of Plaintiff and members of the Class (defined below) and has caused them to pay supracompetitive prices for eggs during the Class Period. Plaintiff brings this class action Complaint against Defendants for violations of Section 1 of the Sherman Antitrust Act and violations of common law.

## II.    JURISDICTION AND VENUE

16.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

17.    **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because they transact business or may otherwise be found in this District. Moreover, Defendant Rose Acre is headquartered in this District.

18.    **Venue.** Venue in this District is proper as Defendants transact business or have registered agents in this District. Venue is also proper in this District because Defendants' conduct, as alleged herein, caused harm to Class members in this District, and Defendant Rose Acre is headquartered in this District.

19.    **Interstate Commerce**. Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming Class members throughout the United States.

## III.    PARTIES

### 1.    Plaintiff

20.    Plaintiff King Kullen Grocery Co., Inc. is a New York corporation with its principal place of business in Hauppauge, New York. Plaintiff purchased Conventional Eggs from one or

4

more distributors who had directly purchased those Conventional Eggs from one or more of the Defendants during the Class Period. By paying artificially inflated prices for Conventional Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint. Plaintiff has standing to pursue the claims alleged herein, in part, because one of Plaintiff's distributors has assigned its antitrust claims for Conventional Eggs to Plaintiff.

### 2. Cal-Maine

21.     Defendant Cal-Maine Foods, Inc. is a public company incorporated in Delaware with its principal place of business in Ridgeland, Mississippi.

22.     Cal-Maine was founded in 1957 as Adams Food. In 1969 it merged with Dairy Fresh Products and Maine Egg Farms to form Cal-Maine Foods. Since then, Cal-Maine has continued to aggressively acquire egg producers around the country. Over the years, Cal-Maine has acquired and integrated nearly 30 companies to become the behemoth it is today. In 2024 alone, Cal-Maine acquired three additional companies and added 5.9 million egg-laying hens to its flock.

23.     Today, Cal-Maine is the largest producer of eggs in the United States. As of 2024, Cal-Maine had nearly 45 million egg-laying hens, and it controlled approximately 20% of national egg sales. It is also a fully integrated company with its operations consisting of hatching chicks; growing and maintaining chicken flocks; manufacturing feed; and producing, processing, packaging and distributing shell eggs. In 2024, Cal-Maine achieved sales of $2.33 billion with over 1.15 billion dozens of eggs sold.

24.     Cal-Maine has forty-nine egg production facilities in the United States, including in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Ohio, Oklahoma, South Carolina, Texas, and Utah.

25.     Upon information and belief, Cal-Maine subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

26.     During the Class Period, Cal-Maine sold Conventional Eggs to purchasers in the United States, including members of the Class.

### 3.  Rose Acre

27.     Rose Acre Farms, Inc. is a private company incorporated in Indiana with its principal place of business in Seymour, Indiana.

28.     Rose Acre is the second largest egg producer in the United States. As of 2024, it had nearly 26 million egg-laying hens.

29.     Rose Acre has sixteen egg production facilities in the United States. These facilities are located in Indiana, Illinois, Missouri, North Carolina, Georgia, Iowa, and Arizona.

30.     Upon information and belief, Rose Acre subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

31.     During the Class Period, Rose Acre sold Conventional Eggs to purchasers in the United States, including members of the Class.

### 4.  Versova

32.     Versova Holdings, LLC is a private company incorporated in Delaware with its principal place of business in Sioux Center, Iowa.

33.     Versova is one of the largest egg producers in the United States. As of 2024, it had over 18 million egg-laying hens.

34.     Versova has several egg production facilities in the United States, including five in Iowa. It also has facilities in Ohio, Washington, and Oregon.

35.     Upon information and belief, Versova subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

36.     During the Class Period, Versova sold Conventional Eggs to purchasers in the United States, including members of the Class.

### 5. Hillandale Farms

37.     Defendant Hillandale Farms is comprised of several related companies, including Defendants Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms East, Inc.—all incorporated in Pennsylvania—and Hillandale Farms, Inc., incorporated in Ohio. Hillandale Farms is headquartered in Gettysburg, Pennsylvania.

38.     Hillandale Farms is one of the largest egg producers in the United States. It produces approximately 38 million dozen eggs per month. As of 2024, it had nearly 19 million egg-laying hens.

39.     Hillandale Farms has several egg production facilities in the United States, including in Pennsylvania and Ohio.

40.     Hillandale Farms was recently acquired by Luxembourg-based company Global Eggs for over $1 billion.

41.     Upon information and belief, Hillandale Farms subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

42.     During the Class Period, Hillandale Farms sold Conventional Eggs to purchasers in the United States, including members of the Class.

### 6. Daybreak Foods

43.     Daybreak Foods, Inc. is a private company incorporated in Wisconsin with its principal place of business in Lake Mills, Wisconsin.

44.     Daybreak Foods is one of the largest egg producers in the United States. It produces approximately 16 million eggs per day. As of 2024, it had over 20 million egg-laying hens.

45.     Daybreak Foods has several egg production facilities in the United States, including in Wisconsin, Minnesota, Iowa, and Ohio.

46.     Upon information and belief, Daybreak Foods subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

47.     During the Class Period, Daybreak Foods sold Conventional Eggs to purchasers in the United States, including members of the Class.

### 7.  Urner Barry

48.     Urner Barry Publications, Inc. is a private company incorporated in New Jersey with its principal place of business in Toms River, New Jersey. For decades Urner Barry has published egg prices to industry participants, including the Egg Producer Defendants.

49.     Urner Barry began in the mid-1800s when New York City-based printer Benjamin Urner began publishing market reports providing pricing on various agricultural goods shipping in and out of New York. Initially, the report was called the "Producers' Price-Current," but later became known as the "Urner Barry's Price-Current." In the 1960's Urner Barry Company renamed itself to Urner Barry Publications and moved from New York to New Jersey.

50.     From the mid-1970's onward, Urner Barry would begin to implement a slew of new publications and services covering various new markets. While Urner Barry had covered poultry and egg markets for decades, in 1975 Urner Barry broke into the seafood market with the debut of the Seafood Price Current. In 1976, Urner Barry would host the very first Executive Conference in New Jersey, an event that would grow to become the most widely attended and recognized marketing event in the poultry and egg industries. In the 1990's, Urner Barry expanded its reporting into the beef, pork, lamb, and veal markets by acquiring National Provisioner's Yellow Sheet.

51.     During the 21st century, Urner Barry introduced Comtell® On-Line ("Comtell"). According to Urner Barry, Comtell is "the most accessible, accurate and timely source for news, quotes and research" in the meat, poultry, pork, veal, seafood, and, critically for this case, egg industries. Comtell subscribers "are updated several times a day on the most impactful market conditions."

52.     Urner Barry was previously a subsidiary of AgriBriefing Limited. In 2023, the U.K.-based Mintec Group acquired AgriBriefing in a deal that included Urner Barry. Like Urner Barry, Mintec is a provider of market intelligence and price data. In 2024, the Mintec Group consolidated all of its operations under a single brand name: Expana.

### 8.  Egg Clearinghouse

53.     Defendant Egg Clearinghouse, Inc. is a Delaware corporation with its offices and principal place of business located in Dover, New Hampshire.

54.     During the Class Period, ECI operated as an online spot market that allows participants to place bids on eggs listed for sale and see the results of trades.

55.     Only ECI members (*i.e.*, farmers and egg buyers) are allowed to trade on the ECI marketplace.

56.     In 2024, 2.6 billion eggs and 39 million pounds of egg products, valued at more than $600 million, were traded on the ECI online platform.

57.     ECI represents just 5% of the shell egg market but plays an outsized role in how eggs are priced nationwide.

### 9.  United Egg Producers

58.     Defendant United Egg Producers d/b/a Egg Farmers of America is a Maine corporation with its offices and principal place of business located in Johns Creek, Georgia.

59.    UEP is a national cooperative of egg farmers representing the ownership of approximately 95% of all the nation's egg-laying hens.

60.    The United Egg Association ("UEA") is a trade association affiliate with UEP. UEP formed the United Egg Association (UEA) in 1983. Expanded in 1995, UEA serves as a national trade association representing three distinct segments of the U.S. egg industry – further processors, allied members, and producers and packers.

### 10. Unnamed Co-conspirators and Other Non-Parties

61.    Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described herein: John Does 1-10. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

62.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

63.    Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

### IV.    FACTUAL ALLEGATIONS

### A.  Egg Production the United States

64.    Eggs are one of the most popular foods in the United States. Eggs are not only an integral part of a typical American breakfast, but they are also commonly used in baked goods and added to any number of dishes, including salads, sandwiches, and even pizza.

65.     The egg industry in the United States is massive. On average, America produces about 100 billion eggs per year. In 2023, the average American ate over 280 eggs over the course of a year.

66.     The egg market is part of the broader poultry industry. Poultry production begins with primary breeders. Primary breeder flocks consist of elite (sometimes called pedigree or foundation) birds, great-grandparent birds, and grandparent birds. Grandparent flocks produce the final generation of breeding birds (multiplier/parent flocks). Eggs from multiplier flocks hatch to become production birds—broilers and egg-laying hens (also called "layers" or "layer hens")—for human consumption. Broiler chicks are shipped to production farms within a day of hatching, where they are raised for meat. Young hens are raised on pullet farms until they reach egg-laying age, then transported to egg production farms.

67.     The egg production cycle is not volatile or subject to sudden, unmanageable shifts. Barring catastrophic events, egg output can be forecasted and adjusted with great precision.

68.     This control makes it possible for producers to intentionally reduce supply, delay new flocks, or retire hens early—actions that, if taken collectively, can artificially constrain supply and raise prices.

69.     Egg producers also maintain cold storage capacity, allowing for inventory management that can further distort apparent supply levels. Producers may withhold eggs from the market during times of low prices or release excess inventory when market prices are favorable.

70.     The cycle's predictability and the long lead times for production decisions create conditions ripe for anticompetitive coordination.

71.     The U.S. government, through the U.S. Department of Agriculture ("USDA"), has established a comprehensive and detailed system of grading and sizing standards that ensures uniformity across the shell egg market.

72.     Specifically, USDA Consumer Grades, such as Grade AA, Grade A, and Grade B, are based on specific interior and exterior quality factors. Similarly, sizes are standardized by weight per dozen, including Jumbo, Extra Large, Large, Medium, and Small. These government-mandated standards strip away most avenues for product differentiation. A "Grade A Large" egg from one producer is, for all practical purposes, identical to and perfectly substitutable with a "Grade A Large" egg from any other producer.

73.     The United States egg industry produces eggs for two primary uses: (a) whole shell eggs sold primarily to retail consumers (the "shell egg" or "table egg" market) and (b) broken, pasteurized eggs sold in liquid or dried form primarily to restaurants, cafeterias, and food manufacturers (the "breaker" market). Historically, about 70% of layer hens produced eggs for the shell egg market, while the remaining 30% of layers produced eggs for the breaker market. A smaller but growing segment of the shell egg market involves "quality-differentiated" products—such as cage-free or organic eggs—that command retail premiums over Conventional Eggs.

74.     Egg production is spread across the United States, with significant production numbers in almost every state.



**Figure 1.**[1]

75.     While eggs are produced nationwide, production is concentrated in the Midwest. The top five egg producing states—Iowa, Ohio, Indiana, Pennsylvania, and Texas—represented nearly half of all laying hens in the United States in 2024.

---

[1] https://www.nass.usda.gov/Charts_and_Maps/Poultry/eggmap.php



**Figure 2.**[2]

## B. Consolidation in the Egg Industry

76.  Throughout most of the twentieth century the egg industry had a highly fragmented production structure that included thousands of independent farms.

77.  In 1978, Watt Publishing Company began conducting industry surveys to provide data about the United States egg industry. The 1978 survey identified only thirty-four companies with flocks of one million or more hens, and those firms accounted for just 27 percent of the nation's laying hens.

78.  In the decades that followed, an aggressive wave of mergers and acquisitions transformed the industry from a decentralized network of family operations into a tightly

---

[2] https://unitedegg.com/facts-stats/

concentrated oligopoly. Between 1900 and 1999, the number of farms in the United States producing eggs dropped from 5 million to under 1000. By 2000, Watt's survey listed 63 companies with 1 million or more hens, and they represented 78% of the nation's total flock.

79.    Today the Egg Producer Defendants—Cal-Maine, Rose Acre, Versova, Hillandale Farms, and Daybreak Foods (sometimes referred to as the "Big Five")—collectively control nearly 50% of all U.S. laying hens.

80.    Cal-Maine alone had nearly 45 million egg-laying hens in 2024, and it controlled approximately 20% of national egg sales.

81.    The remainder of the shell egg market outside of the top producers is mostly made up of small producers.

82.    Regional concentration can be far more acute; in California, for example, the four largest producers control approximately two-thirds of the state's hen inventory.

83.    The rise of this "Big Five" cohort is directly traceable to serial acquisitions that eliminated scores of mid-sized rivals and absorbed their production capacity.

84.    Cal-Maine's watershed moment occurred in 1988, when it tripled its flock overnight by purchasing Cargill's entire egg division. Since then, it has been the largest producer in the egg industry. The company has made at least twenty-five additional acquisitions.

85.    Cal-Maine's other significant acquisitions include:

- **1999:** Hudson Brothers, Inc. of Guthrie, Kentucky, adding approximately 1.2 million layers.

- **2008:** Tampa Farm Service, Inc. and Zephyr Egg Company, adding approximately 6 million layers.

- **2012:** Pilgrim's Pride and Maxim Production Co., adding approximately 4.9 million layers.

- **2016:** Foodonics International, adding approximately 3.1 million layers.

- **2019:** Mahard Egg Farm, adding approximately 3.9 million layers.

- **2022:** Red River Valley Egg Farm, adding 1.7 million layers.

- **2024:** Fassio Egg Farms, Inc., located in Erda, Utah, adding approximately 1.2 million layers, and ISE America, Inc., adding approximately 4.7 million laying hens with production operations in Maryland, New Jersey, Delaware and South Carolina.

86.     Similarly, the other Egg Producer Defendants become dominant in the egg industry through a series of mergers and acquisitions. The following is a sample of recent acquisition activity by the other Egg Producer Defendants:

- **Rose Acre:** In 2020, Rose Acre announced it entered a joint venture with Weaver Brothers Inc. to purchase Opal Foods. At the end of 2019, Opal Foods had nearly 8 million layers.

- **Versova:** Versova began in 2016 through the roll-up of several established producers. It grew its capacity further by acquiring Willamette Egg Farms—adding over 3 million layers—and Rembrandt Foods (now known as Ovation Farms) in 2021.

- **Daybreak Foods:** In 2023, Daybreak Foods acquired Hen Haven, LLC and Schipper Eggs, LLC and in 20222 it acquired Konos, Inc. (d/b/a Vande Bunte Eggs).

- **Hillandale Farms:** In 2025, Hillandale Farms was acquired by Luxembourg-based company Global Eggs for over $1 billion. Global Eggs operates large egg producers around the world and has combined revenues of over $2 billion.

87.    The Egg Producer Defendants are also vertically integrated: they own breeder flocks, operate multiplier and pullet farms, manufacture feed, run in-house grading and breaking facilities, and maintain dedicated trucking fleets.

88.    For example, in addition to its 45 million layers and 49 egg production facilities, Cal-Maine hatches the majority of its chicks in its own multiplier farms and grows them in its own pullet farms. When they reach egg-laying age, Cal-Maine transports them to its own production farms (~90%) or contracted farms (~10%), where they are given feed from Cal-Maine's own feed mills. After eggs are produced, Cal-Maine cleans, grades, and packages them at its own packing facilities for sale as shell eggs or breaks and transforms them into liquid, frozen, or dried form at its own processing facilities for sale as egg products. Finally, Cal-Maine prepares its table-eggs and egg products to be picked up by customers, or ships them to customers' warehouses and retail stores with its own fleet of delivery trucks, or with contracted trucks.

89.    Cal-Maine's vertical reach extends even further: it maintains its own +10 million-bird breeder program, giving it leverage over the replenishment stock needed by rivals that lack comparable breeding capacity. In a 2020 investor presentation, Cal-Maine touted that "[f]rom hatching to production, our facilities are capable of producing and processing 6.6 million eggs per hour."



**Figure 3.[3]**

90.    Defendant Rose Acre also has a breeder flock. Independent producers without breeder flocks must source replacement pullets either from Cal-Maine and Rose Acre or from a two-firm genetics duopoly— Hendrix Genetics and EW Group—further narrowing their options.

91.    Hendrix Genetics and EW Group control the "parent flock," which produces the entire supply of pullets sold to downstream egg producers.

92.    This duopoly at the top of the supply chain functions as a structural chokepoint in the egg market which helps facilitate the producer-level conspiracy. The genetics firms, simply by acting in their own independent, profit-maximizing interest (i.e., restricting pullet supply to keep pullet prices high), have the effect of protecting the downstream collusive arrangement. Their actions, whether coordinated with producers or not, create a risk of input foreclosure, preventing other producers from easily expanding supply and stopping new entrants from competing away the supracompetitive egg prices.

---

[3] Cal-Maine, Investor Presentation (August 2020).

93.    Moreover, smaller companies do not have equal access to rebuild their flocks as quickly as the most dominant firms.

## C. Anticompetitive Conduct

94.    Historically the U.S. egg industry has been characterized by relatively stable prices. The prices received by egg producers fluctuated in a narrow range for most of the 20th century, with the industry regularly going through mild price-output cycles. Since the industry's consolidation in the 1980s and 1990s, however, cyclic fluctuations have become less prevalent, and the industry has been increasingly characterized by production rigidity, both in the face of rising prices and in the face of declining prices. Following the supply shocks during the 2020 COVID-19 pandemic, Defendants hatched their conspiracy to fully break the cycle and raise egg prices to the highest level on record.

95.    In fact, during the first half of 2025, the average price of grade A egg prices shattered historical price records, going as high as $6.23 per dozen in March 2025.

96.    While Egg Producer Defendants have attributed these price increases to supply disruptions caused by HPAI outbreaks beginning in late 2021, the price spikes exceeded what the flock losses explain.

97.    The massive price increases are, instead, a product of Defendants' conspiracy. Specifically, egg producers, including the Egg Producer Defendants, coordinated with each other to systematically increase the price of eggs by manipulating egg pricing benchmarks such as those published by Urner Barry and ECI.

### a.  Urner Barry and ECI Provide Egg Price Benchmarks

98.    Unlike other agricultural commodities like soy, coffee, and sugar traded on transparent public exchanges, eggs lack a regulated exchange, and price discovery has effectively been delegated to (i) Defendant Urner Barry, which issues the "Urner Barry quote" or "UB quote"

which serves as a *de facto* pricing benchmark for eggs nationwide, and (ii) to Defendant ECI, a members-only platform which publishes trading-based prices among producers and serves as an information exchange and contract-setting tool for large-scale transactions.

99.     Most egg pricing is anchored to daily wholesale quotations published by Defendant Urner Barry in its Price-Current report, a trade publication that serves as the bellwether for egg contracts nationwide. Urner Barry also publishes benchmarks or indexes that condense its reported quotations into numeric benchmarks used in commercial contracts. Urner Barry's egg quotations (UB quotes) have been the industry's benchmark for over a century.



**Figure 4.**[4]

100.     Defendants and their co-conspirators were well aware that Urner Barry's Price-Current reports and indexes served as the *de facto* bellwether for egg pricing nationwide.

101.     The overwhelming majority of wholesale egg contracts are based on Urner Barry's daily quotations as the reference price, meaning even small upward shifts in reported values immediately translate into higher prices for purchasers.

102.     Cal-Maine's annual SEC filings during the Class Period confirm that "the majority of conventional shell eggs sold in the U.S. in the retail and foodservice channels are sold at prices

---

[4] https://www.comtell.com/Marketing/Market-Prices

that take into account, . . . quoted wholesale market prices, such as those published by Urner Barry."[5]

103.    Urner Barry compiles its daily reports by soliciting information from producers, distributors, brokers, and buyers—including the Egg Producer Defendants—regarding transaction prices, bids, and offers. Urner Barry also takes into account prices gleaned from the Egg Clearinghouse, but as Karyn Rispoli, a managing editor at Urner Barry, said on a 2024 podcast, "[Egg Clearinghouse] rarely paints the entire picture, and that's where we [Urner Barry] come in."[6]

104.    Urner Barry's reporters collect data by telephone, e-mail, text message, and instant messaging from 8:45 a.m. to 5:00 p.m. Eastern each business day.

105.    Because virtually all commercial egg transactions reference Urner Barry's numbers, even modest movements in Urner Barry's daily quotation instantaneously re-price billions of eggs in the pipeline. The leverage created by this centralization gave Defendants a powerful incentive to influence the benchmark.

106.    Urner Barry purports to follow an "IOSCO-compliant" methodology that is supposed to prioritize reliable, impartial pricing data. An Urner Barry spokesperson stated that "We [Urner Barry] guard against the risk of manipulation by adhering to the IOSCO methodology."[7]

---

[5] *See, e.g.*, Cal-Maine Foods, Inc., Form 10-K for Fiscal Year ended May 28, 2022, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000016160/000156276222000297/calm-20210529_10K.htm.

[6] "Unscrambling the Dynamics of Egg Pricing with Market Reporter Karyn Rispoli, Urner Barry," *Poultry Leadership Podcast* (Feb. 20, 2024).

[7] https://hntrbrk.com/big-egg/

107.     Urner Barry is audited every year by accountancy firm BDO USA P.C. ("BDO") for compliance with IOSCO standards. While Urner Barry claims that it has "passed every audit,"[8] recent reports suggest that BDO is not a reliable accounting firm and has consistently failed to meet United States accounting standards. In 2023, "[t]wo-thirds of [BDO's] audits picked for inspection fell short of US standards."[9]

108.     In addition to its daily market quotations, Urner Barry also publishes forward-looking egg market forecasts. These forecasts provide outlooks on future supply, demand, and pricing trends, drawing on predictive inputs such as eggs in incubators, chicks hatched, intended placements, rate of lay, along with other factors. Urner Barry advertises these reports as tools that allow subscribers to "identify trends before they happen" and "create sound business strategies."[10]

109.     While less than 5% of the egg transactions occur on the ECI, the marketplace still plays an outsized role in Conventional Egg pricing, as Urner Barry incorporates transaction prices from ECI's spot market into its price quotes.

110.     The relatively small number of transactions on the ECI, combined with Defendants' dominant market position with respect to smaller producers, enabled the Egg Producer Defendants to easily influence the volume and pricing on the ECI platform, which are then incorporated into the Urner Barry quote. The dominant firms did not need to coordinate with hundreds of fringe producers; they only needed to coordinate among themselves in a way that artificially inflated the ECI prices.

---

[8] https://hntrbrk.com/big-egg/

[9] https://www.bloomberglaw.com/bloomberglawnews/financial-accounting/X5OP4188000000?bna_news_filter=financial-accounting#jcite

[10] https://urnerbarry.com/Consulting/Blog/UBC-Blog/1241895

111.    Additionally, the ECI is a member-only platform comprised of farmers and ECI's egg buyers board. Historically, the board included industry executives (including Cal-Maine's founder), underscoring close producer involvement in the information channel that feeds benchmarks.

112.    In these ways, Urner Barry and ECI amplify price swings led by the largest-volume producers and prevent independent, competitive decision-making by others.

   **b.  Egg Producers Conspired to Artificially Increase the Price of Eggs Using Urner Barry Egg Price Indexes**

113.    As explained above, egg pricing is anchored to daily wholesale quotations published by Defendant Urner Barry.

114.    This structural feature of the egg market ensures that any inflation in Urner Barry's benchmark prices is rapidly transmitted throughout the entire industry. Over 95% of eggs are sold pursuant to contracts pegged to Urner Barry's quotations, and fewer than 5% of eggs are sold on the ECI spot market (which Urner Barry also takes into account). Cal-Maine, for instance, acknowledged in a press release that "a majority of [its] conventional eggs are sold based on market quotes published by Urner Barry."[11] As a result, even modest artificial increases in reported prices cascade into higher prices for nearly every downstream transaction.

115.    Because Urner Barry's pricing is based in substantial part on self-reported transaction data from dominant firms, it is inherently susceptible to manipulation. By submitting elevated prices, the Egg Producer Defendants can push Urner Barry's benchmark upward, knowing that the new higher price will be automatically applied to future contract deliveries.

---

[11] https://calmainefoods.gcs-web.com/node/13221/pdf

116.    This creates a self-reinforcing feedback loop. Elevated benchmark prices increase the revenue received on each sale, which in turn increases the baseline for the next round of reporting. The system thereby amplifies any upward movement and resists downward price corrections, particularly in a concentrated market where the largest players account for almost 50% of all production.

117.    The opportunities for manipulation are exacerbated by the fact that most eggs sold in the U.S. are Conventional Eggs, whose prices are almost universally tied to Urner Barry quotations. Specialty and cage-free eggs—whose prices are more often linked to actual production costs under long-term contracts—did not experience nearly the same magnitude of price spikes during the conspiracy period.

118.    For example, in the five months prior to the 2021 HPAI outbreak, cage-free eggs averaged $0.65 more per dozen than conventional eggs, reflecting higher production costs. By 2022, however, conventional egg prices—driven by Urner Barry indices—rose so sharply that *they exceeded cage-free prices by $0.33* on average. In 2023 and 2024, cage-free eggs were only 17% and 2% higher than conventional eggs, respectively. This inversion is inexplicable absent coordinated conduct in the conventional egg market.



**Figure 5.**[12]

119.    This was not the first time the egg industry had been hit by a massive bird flu outbreak. The monthly reduction in the egg-laying flock size since 2022 was similar to those in 2015, when avian flu killed 43 million egg-laying hens. Nevertheless, prices since 2022 have risen ***more than three times*** more per lost hen than they did during the earlier outbreak.

120.    Historical precedent underscores the risks inherent in such a system. In the poultry and other meat industries, companies have been accused of using price reporting agencies like Urner Barry to facilitate anticompetitive information sharing.

121.    The same vulnerabilities exist in the egg market. Urner Barry's methodology allows for selective reporting, and the company does not verify every transaction reported by industry participants. Instead, it aggregates and "scrutinizes" the information according to its own proprietary methods, the details of which are not subject to public oversight.

122.    This opaque process invites abuse in a market dominated by a handful of vertically integrated producers. The Egg Producer Defendants can monitor each other's reported prices,

---

[12] https://hntrbrk.com/big-egg/

verify adherence to coordinated price levels, and punish deviations by reverting to benchmark-linked pricing in subsequent transactions.

123.    Analysts and consumer advocates have noted that bird flu losses in recent years have been insufficient to explain the magnitude of the price spikes. Hunterbrook's analysis of USDA data found that the effective reduction in the national hen flock was only about 1% compared to 2021, yet average wholesale prices rose 127% in 2022. Average wholesale prices rose 54.6% in 2023—a 17% increase in price per 1% decrease in supply— and 127.7% in 2024—a 25% increase in price per 1% decrease in supply.[13]

124.    Indeed, from 2022 through 2024, price increases per unit of supply loss were three to four times greater than during the 2015 avian flu outbreak—a disparity that cannot be explained by legitimate cost or demand changes.

125.    Moreover, the Egg Producer Defendants were able to repopulate quickly relative to the 2015 outbreak due to their large size and vertical integration. For example, Cal-Maine lost a total of 3.7 million chickens to avian flu in two of its facilities in Kansas and Texas in December 2023 and April 2024, but by early November had added 8 million hens to its flock, more than recovering from its losses in just six months. In fact, Cal-Maine's total flock was actually 15% *higher* than it was before 2022.[14]

126.    A key distinction from the 2015 HPAI episode is the unusually slow recovery of the layer flock. This slow response may be explained by structural constraints in the pullet pipeline originating from the upstream genetics duopoly. During the 2022-2024 "crisis," the parent flock –

---

[13] Jenny Ahn, Julia Case-Levine, & Vibhor Mathur, *Cracking Big Egg: Why the Industry's Narrative Doesn't Add Up*, HUNTERBROOK (Mar. 6, 2025), https://hntrbrk.com/big-egg/.

[14] *Id.*

which produces the replacement layer hens – was itself dramatically reduced, from 3.1 million in 2021 to 2.5 million in 2025.

127.    This upstream bottleneck explains how a producer-led conspiracy could have remained durable. This "managed scarcity" prevented normal market correction (i.e., new entry or expansion) that would have otherwise competed away supracompetitive prices.

128.    Additionally, the actual domestic egg supply fell even less than the flock size, due to a significant reduction in egg export and an unprecedented increase in laying rate per hen, owing to improved genetics.

129.    The U.S. egg price spike is even more puzzling when compared to Europe, which also saw a massive supply shortage in 2022 after 50 million layers were depopulated — compared to 43 million in the U.S. And yet, prices only rose about 30% in Europe from January 2022 to January 2023, compared to nearly 170% in the U.S.

130.    The correlation between Urner Barry's quotations and conventional egg price spikes, combined with the absence of competitive market discipline, supports a strong inference that Defendants used the Urner Barry system to communicate, monitor, and enforce supracompetitive pricing.

131.    In this way, Urner Barry served as both the hub for exchanging competitively sensitive pricing information and the enforcement mechanism for maintaining elevated price levels. This dual role magnified the anticompetitive harm, depriving the marketplace of independent price setting and ensuring that the benefits of inflated prices accrued collectively to the Egg Producer Defendants.

132.    The vertical integration of the Egg Producer Defendants further strengthened the effectiveness of this arrangement. With control over breeding, production, processing, and

27

distribution, these firms could maintain tight supply discipline while ensuring that all their sales—across all stages—reflected Urner Barry's elevated benchmarks.

133.    Because of the Defendants' market concentration, deviations from Urner Barry's benchmarks could be swiftly detected and addressed. Any short-term gain from discounting would be outweighed by the risk of retaliation in future transactions, making adherence to coordinated prices the rational choice for all conspirators.

134.    The resulting price increases have generated extraordinary profits for the Egg Producer Defendants. Cal-Maine, for example, reported gross margins approaching 40% during the conspiracy period, and in some quarters profits increased by nearly 950% compared to pre-2022 levels.

135.    These profits came directly at the expense of egg purchasers, including Plaintiff and members of the Class, who paid vastly more for eggs than they would have in a competitive market.

136.    The conduct described herein is inconsistent with unilateral, competitive behavior. It is instead indicative of a coordinated strategy, implemented through a centralized price reporting system, to fix, raise, and maintain egg prices at artificially high levels in violation of the Sherman Act.

### c.  Input Price Increases do not Explain Egg Price Increases

137.    Feed – primarily corn and soybean meal – is the major cost component in the production of shell eggs, accounting for more than half of farm production costs.

138.    Fuel costs, typically propane or natural gas, is another input to poultry farming.

139.    Data from the U.S. Bureau of Labor Statistics show that these cost inputs have decreased since 2022.

140.    Cal-Maine's financial disclosures confirm that production costs have gone down, not up, as Cal-Maine's profits have skyrocketed.

141.    Under competition, one would expect price paths to track costs and supply shocks. That has not been the case in the shell egg market. Instead, prices and costs have diverged, to the profit of shell egg producers.

### d.  U.S. Department of Justice and New York Attorney General Investigations

142.    On March 6, 2025, various news outlets, including *The Capitol Forum* and *The Wall Street Journal*, reported that DOJ was investigating whether egg producers—including Defendants Cal-Maine and Rose Acre—had conspired to raise prices of eggs. According to the reporting, DOJ sent letters to egg producers asking them "to preserve documents about their pricing conversations with customers and competitors, as well as communications with Urner Barry."[15]

143.    In a 10-Q SEC filing published April 8, 2025, Defendant Cal-Maine confirmed it was under investigation by DOJ. In that filing it stated that it received a civil investigative demand from DOJ in March 2025.

144.    After the investigation became public, egg prices dropped precipitously. For instance, on March 5, the average wholesale cost of a dozen large grade A white eggs was $8.12. On March 19, about two weeks after DOJ's investigation became public those same eggs cost $3.03—*a 62.7 percent decrease*. Egg prices at retail also dropped around this time. The speed and magnitude of the price drop strongly suggest that prior egg prices were sustained through coordinated conduct, rather than competitive market forces.

---

[15] Dave Michaels, "Justice Department Opens Probe of Sharp Surge in Egg Prices," *The Wall Street Journal* (March 7, 2025).



**Figure 6.**[16]

---

[16] https://www.thesling.org/did-dojs-investigation-of-the-egg-industry-cause-egg-prices-to-fall/



**Figure 7.**[17]

145.    On May 8, 2025, Senators Elizabeth Warren (D-Mass.) and Jim Banks (R-Ind.) released a letter in support of DOJ's investigation. In their letter, the senators were skeptical of the claims of egg producers and trade associations that recent avian flu outbreaks were the sole cause of high prices. They expressed that they "are concerned that record high egg prices reflect noncompetitive behavior among large producers." Additionally, the senators urged DOJ "to

---

[17] https://www.thesling.org/did-dojs-investigation-of-the-egg-industry-cause-egg-prices-to-fall/

consider whether a precipitous drop in egg prices just days after reports of the investigation broke suggests that egg producers had conspired to artificially inflate prices."[18]

146.    Most recently, in a 10-Q SEC filing published October 1, 2025, Defendant Cal-Maine, disclosed that it "received a subpoena from the State of New York requesting information and documents related to its investigation of anticompetitive conduct and high egg prices in the egg industry."[19]

### e.  Prior Actions Against Defendants

147.    The egg industry, including several of the Defendants named here, have previously been targeted by private litigants and government enforcers for anticompetitive and unfair business practices.

148.    Starting in September 2008, egg producers, including Cal-Maine, Rose Acre Hillandale Farms, and Daybreak Foods, were named as defendants in numerous antitrust cases. In these actions, the plaintiffs alleged, among other things, that, to raise the price of eggs, these egg producers conspired to restrict egg production through a sham animal-welfare program that reduced the laying hen flock sizes. The cases were consolidated as a multi-district litigation in the Eastern District of Pennsylvania under the name *In re Processed Egg Products Antitrust Litigation*, No. 08-md-2002. While some egg producers escaped liability, several, including Cal-Maine and Hillandale, settled the claims for millions of dollars.

149.    In 2019, *Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al*., an action brought by certain large buyers of egg products, was remanded out of the multi-district

---

[18] Letter to Gail Slater, Assistant Attorney General, from Senators Warrant and Banks, *available at* https://www.warren.senate.gov/newsroom/press-releases/senators-warren-banks-in-bipartisan-letter-push-doj-to-investigate-high-egg-prices-anticompetitive-behavior-by-egg-producers.

[19] https://calmainefoods.gcs-web.com/static-files/a09de99a-4b6b-44de-be16-ed07f41d2730

litigation to the Northern District of Illinois, for trial. The case went to trial on October 17, 2023, against defendants including Cal-Maine and Rose Acre. On December 1, 2023, the jury returned a decision finding the defendants engaged in a conspiracy to fix the prices of eggs. The jury awarded the plaintiffs $17.8 million in damages ($53.3 million when trebled).

150.    In 2020, the New York Attorney General alleged that Hillandale Farms exploited the COVID-19 pandemic to charge "unconscionably excessive" prices, justified by Urner Barry's indices, which themselves were based on data supplied by the industry. In the complaint, New York alleged that "Urner Barry's indices work like a feedback loop: Egg producers such as Hillandale tell Urner Barry their 'assessments' of egg prices; Urner Barry then repeats back to the egg industry their collective assessment, distilled into indexed prices; and egg producers such as Hillandale then use Urner Barry's indexed prices as benchmarks to price their eggs."[20] In 2021, the case was settled, and Hillandale agreed to donate 1.2 million eggs to local food banks throughout New York state.

151.    In 2021, Alaska accused Urner Barry of aiding broiler producers in an "anticompetitive output restriction scheme" by serving as a conduit for competitively sensitive information and facilitating production cuts.[21]

**f.    Defendants' Systematic Exchange of Competitively Sensitive Information via Urner Barry Violates Section 1 of the Sherman Act**

152.    Defendants' information exchange amounts to an unlawful agreement in violation of Section 1 of the Sherman Act.

153.    In 1996, FTC and DOJ published "Statements of Antitrust Enforcement Policy in Health Care" (the "1996 Policy"). The 1996 Policy gave guidance to the health care industry on

---

[20] Verified Petition, *New York v. Hillandale Farms Corporation, et al.*

[21] Complaint, *Alaska v. Agri Stats, Inc. et al.*, No. 3AN-21-04632CI (Sup. Ct. Alaska).

various antitrust issues, including information sharing, and this has since been applied to industries outside of healthcare. Among other things, the 1996 Policy provided an "antitrust safety zone" for information exchanges. According to the 1996 Policy, an information exchange that fell within the safety zone was unlikely to raise antitrust concerns and would unlikely be challenged by the agencies. In subsequent years, the agencies used this safety zone as a general guideline for the legality of information exchanges in other industries.

154.    The 1996 Policy was recently withdrawn by the DOJ. But while it was operative, to qualify for the safety zone, the information exchange would have had to meet the following requirements:

- The information exchange was managed by a third-party, like a trade association or government agency;

- the information provided by participants was relatively old (e.g. more than three months old); and

- the information was aggregated to protect the identity of the underlying sources, and enough sources were aggregated to prevent competitors from linking particular data to an individual source.

155.    The agencies published this policy "to ensure that an exchange of price or cost data is not used by competing providers for discussion or coordination of provider prices or costs." It was important to the agencies that "providers [were] aware of the potential antitrust consequences of information exchanges among competitors." The agencies explained that these conditions were carefully crafted to balance a competitor's individual interests in obtaining useful information "against the risk that the exchange of such information may permit [competitors] to communicate with each other regarding a mutually acceptable level of prices."

156.    DOJ has recently demonstrated a renewed focus on prosecuting anticompetitive information sharing. As a result, on February 3, 2023, DOJ withdrew three antitrust policy statements, including the 1996 Policy discussed above. Critically, when announcing the withdrawal, DOJ said that "the statements *are overly permissive on certain subjects, such as information sharing, and no longer serve their intended purposes of providing encompassing guidance to the public on relevant . . . competition issues in today's environment*."

157.    The withdrawal of the policy statements was preceded by remarks made by principal Deputy Assistant Attorney General Doha Mekki on February 2, 2023, in which she said that "throughout its enforcement and policy work, the DOJ has had 'serious concerns' about whether the factors set out in the safety zones are appropriate for the industry as it exists today." Mekki noted that "[e]xchanges facilitated by [third-party] intermediaries can have the same anticompetitive effect as direct exchange among competitors." Additionally, she said that "the suggestion that data that's at least three months old is unlikely to be competitively sensitive or valuable is underpinned by the rise of pricing algorithms that can increase the competitive value of historical data."

158.    Following the withdrawal of the policy statements, at a conference in March 2023, Deputy Assistant Attorney General Michael Kades commented on DOJ's new position related to information sharing. Responding to questions on what proper information sharing looks like without safe harbors, Kades said that "top-of-mind questions should be what information is being shared, how it is being used, and what the impacts are of that sharing. Any time information sharing appears to be suppressing price competition or eliminating other forms of competition, 'that should send red sirens off.'"

159.    Expanding further, at the 2024 American Bar Association Antitrust Spring Meeting, DOJ antitrust division attorney Kathleen Kiernan stated that "information may be a couple of years old" and still run afoul of antitrust laws forbidding anticompetitive information exchanges. She emphasized that "DOJ looks at the nature of information exchanged and the age of the information . . . there's not a one-size-fits-all approach to ensuring information exchanges have 'absolutely no concern' for antitrust enforcers."[22]

160.    Later in 2024, DOJ filed a Statement of Interest in *In re Pork Antitrust Litigation*, 18-cv-01776 (D. Minn.), where it reiterated its stance against anticompetitive information exchanges. In the Statement, DOJ stated that it filed the Statement to make clear that "(1) information sharing alone can violate Section 1, even without proof of an agreement to fix prices; and (2) information exchanges that report only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors."[23]

161.    DOJ's position has not changed during the current Administration. In March 2025, Ryan Tansey, the section chief of the DOJ antitrust division's Washington Criminal Section, said at a conference "If I make no other point today, I just want to be very clear that that is not correct. . . . Characterizing conduct as an information exchange shouldn't be thought of as a way to insulate businesses from criminal antitrust scrutiny."[24]

162.    That same month, DOJ submitted a Statement of Interest in *In re Multipan Health Insurance Provider Litigation*, 1:24-cv-06795 (N.D. Ill.), in which it stated that "[c]oncerted action

---

[22] Chris May, "Exchanges of 'years-old' labor market data still create antitrust risk, US DOJ official says," mLex (April 11, 2024), *available at* https://content.mlex.com/#/content/1555754/exchanges-of-years-old-labor-market-data-still-create-antitrust-risk-us-doj-official-says.

[23] *In Re Pork Antitrust Litigation*, 18-cv-01776 (D. Minn.), Dkt. 2616.

[24] Chris May, "Outsourced pricing doesn't 'skirt' antitrust liability, US DOJ official says," mLex (March 11, 2025), *available at* https://content.mlex.com/#/content/1637762/outsourced-pricing-doesn-t-skirt-antitrust-liability-us-doj-official-says?referrer=portfolio_openrelatedcontent.

is conduct that joins together separate decisionmakers and thus deprives the marketplace of independent centers of decisionmaking. . . . Such joint action can take a variety of forms, from a written contract, to a trust agreement, to a secret conspiracy, **to the joint delegation of decisionmaking power to a common agent**."[25] (emphasis added; internal quotations and citations omitted).

163.    Considering DOJ's position that information exchanges can be anticompetitive regardless of their exact form, Defendants' information exchange violates Section 1 of the Sherman Act. Defendants' information exchange existed for the purpose of "depriv[ing] the marketplace of independent centers of decisionmaking,"[26] increasing egg prices above competitive levels, and maintaining those supracompetitive prices.

### g. "Plus Factors" in the Egg Industry Provide Additional Evidence of a Conspiracy

164.    Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[27] Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism. The factors that provide the most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."[28]

---

[25] *In re Multipan Health Insurance Provider Litigation*, 1:24-cv-06795 (N.D. Ill.), Dkt. 382.

[26] *Id.*

[27] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

[28] *See id.* at 396-97.

165.    Here, several plus and super plus factors support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel. These include: (1) Defendants' exchange of competitively sensitive information; (2) the presence of a price-verification scheme; (3) a motive to conspire; (4) opportunities and invitations to collude; (5) an increasingly concentrated market; (6) high barriers to entry; and (7) a commodity product.

166.    ***First***, the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[29] As described above, Defendant Urner Barry compiles daily market reports by soliciting pricing information from producers, distributors, brokers, and buyers—including the Egg Producer Defendants—regarding transaction prices, bids, and offers. Egg producers, such as the Egg Producer Defendants, are able to maximize their prices by matching the benchmarks Urner Barry calculates based on the transaction data it receives. The data Urner Barry uses to calculate its benchmarks is data that would normally be kept confidential, given its competitively-sensitive nature. Because an egg producer would be competitively disadvantaged by sharing private data unilaterally, a rational actor would only do so with the expectation that it will benefit from similar private information shared by its competitors. Moreover, since it is well known in the egg industry that over 95% of eggs are sold pursuant to contracts pegged to Urner Barry's price quotations, each individual Egg Producer Defendant can be reasonably certain that the other Egg Producer Defendants are supplying their competitively sensitive information to Urner Barry and are using the pricing benchmarks Urner Barry provides to maximize their egg prices.

---

[29] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

167.    The risk of collusion is further heightened because Urner Barry disseminates forward-looking forecasts to its subscribers. By jointly relying on the same projections of future supply, demand, and pricing, the Egg Producer Defendants could align their expectations and production plans around shared market outlooks—coordinating not only current pricing but anticipated future conditions. Such forward-looking data magnifies the anticompetitive potential of Urner Barry's system by enabling the Egg Producer Defendants to adjust production and pricing behavior in parallel based on common forecasts.

168.    **Second**, Urner Barry provides participating egg producers with a price-verification scheme, or "the practice of a seller reporting to its competitors the details of completed transactions with specific customers."[30] With Urner Barry, egg producers, such as the Egg Producer Defendants, are able to see benchmarks that measure where an egg producer stands in relation to others in their market. These benchmarks are based on actual transactions. This type of price-verification makes little sense absent collusion.

169.    **Third**, Urner Barry provides egg producers, including the Egg Producer Defendants, with a motive to conspire by advertising that Urner Barry provides valuable information to support maximizing profits.

170.    **Fourth**, Egg Producer Defendants are involved in multiple industry trade associations and regularly attend trade meetings, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy.

171.    The Egg Producer Defendants are members of UEP and AEB (American Egg Board), national trade associations representing large U.S. egg producers. These associations host

---

[30] *Id.* at 1601.

meetings, conferences, and committee gatherings that bring together high-level executives from competing firms, providing a forum for illegal discussions and coordination.

172.    For example, since 2021, the AEB and UEP have hosted an annual joint conference attended by Producer Defendants.

173.    Moreover, employees of the Egg Producer Defendants have been on the board of UEP. For instance, In October 2023, Sherman Miller (CEO of Cal-Maine Foods) was elected Treasurer of the Board of UEP for 2024, and Marcus Rust (CEO of Rose Acre Farms) was elected as a representative at-large. The presence of senior executives from multiple Defendants in UEP's top leadership provides a continuing forum for regular communication and alignment among competitors.

174.    Trade associations also create and disseminate "guidelines," "certification programs," and industry data that can be used as vehicles to orchestrate and monitor a collusive scheme. In fact, "at trial, the most important part" of the adjudicated conspiracy in *Kraft* was the "UEP Certified Program," which aided producers such as Cal-Maine and Rose Acre in restricting the supply of eggs.[31] UEP Certified is still in force today.

175.    Additionally, Urner Barry hosts an annual Executive Conference which employees of Defendants have attended during the Class Period, including employees of Rose Acre, Daybreak, and Urner Barry. Urner Barry markets this event as "a must-attend event for decision-makers in the protein industry . . . Where the protein industry's most influential members go to network, learn and advance their professional development."[32] Employees of Defendants have even been seen together at these conferences. As shown in Figure 8 below, Urner Barry and Rose

---

[31] *See Kraft*, 2024 WL 4346418 at *5.
[32] https://redmidia.com/eventos/urner-barrys-executive-conference-2021/

Acre employees were photographed together at the 2011 conference. In 2021, Bill Rehm, CEO of Daybreak, was a guest speaker at the conference. Finally, Defendants, including at least Cal-Maine, have sponsored this event in the past. Trade association membership and industry events provide Defendants opportunities to collude.



*Wonderful weather and good company led to smiles all around for (L to R) Michele and Arron Heironimus, Rose Acre; Scott, Becky and Roger Seger, Wabash Valley; Urner Barry's Rick Brown; and Mickey Seger.*

**Figure 8.[33]**

176.    ***Fifth,*** the egg market is increasingly becoming more concentrated. While the industry was once highly fragmented, in recent years large egg producers, including the Egg Producer Defendants, have grown exponentially through acquisitions. A conspiracy is easier to effectuate, maintain, and enforce in a concentrated industry.

177.    ***Sixth***, egg producers face significant entry barriers including financial, regulatory, operational, and logistical costs.

178.    Potential new entrants face a variety of capital costs, including land acquisition, construction of specialized poultry houses, and purchases of feeding, watering, climate control, and waste management equipment.

179.    Potential new entrants would also need to displace long-standing customer relationships.

---

[33] https://www.urnerbarry.com/reporter/issues/ReporterV6N3_WEB.pdf

180.     Thus, new entrants into the market are unlikely to discipline cartel pricing.

181.     *Seventh*, Conventional Eggs are a fungible commodity with minimal product differentiation, a market characteristic that greatly simplifies the formation and maintenance of a price-fixing conspiracy. When products are homogenous, firms compete primarily on price. This creates a powerful incentive to collude, as price competition in a commodity market can be destructive to profits. By agreeing to fix prices or restrict output, competitors can avoid price wars and collectively exercise market power.

182.     Government grading standards make Conventional Eggs functionally identical, eliminating non-price competition and simplifying the detection of price deviations.

183.     Conventional Eggs also exhibit relatively inelastic demand— i.e., consumers purchase similar quantities regardless of price fluctuations. Indeed, demand for eggs remained steady throughout the higher prices during the Class Period.

184.     As one Cal-Maine investor presentation noted, "The price of eggs in relation to the overall amount we spend on groceries does not matter. A $1-$2 increase in an item we purchase once a month is not that big of deal in the grand scheme of things."[34]

185.     Because of this price inelasticity, the structure of the egg production market makes the egg industry particularly susceptible to price manipulation. Small artificial reductions in supply can yield disproportionately large increases in price and profit for producers, including Defendants.

## V.   ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKET

186.     Defendants' anticompetitive conduct had the following effects, among others:

---

[34] *See* Cal-Maine 2Q 2025 Investor Presentation, *supra* n.82 at 5.

- Competition among the Egg Producer Defendants has been restrained or eliminated with respect to egg prices;

- The price of eggs has been fixed, stabilized, or maintained at artificially high levels; and

- Individuals have been deprived of free and open competition.

187.    Defendants' violations of the antitrust laws have caused Plaintiff and members of the Class to pay higher prices for eggs than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiff and members of the Class have suffered damages in the form of overcharges paid on their egg purchases. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing agreement and information exchange are *per se* unlawful, or, alternatively, are unlawful under either a quick look or rule of reason analysis.

188.    Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. However, Plaintiff defines such markets below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

### A. The Relevant Product Market Is Conventional Shell Eggs

189.    To the extent a relevant product market needs to be defined in this action, it is the market for conventional "shell eggs", also known as "table eggs." Shell eggs are eggs in the form most familiar to buyers: fresh, uncooked, and in an intact shell. Most shell eggs are sold at retail outlets such as grocery and convenience stores.

190.    According to the USDA, in 2023, approximately 70% of eggs produced in the United States were sold as shell eggs. The remaining 30% of eggs produced in the United States were sold as egg products (i.e. shell eggs broken and sold in liquid, frozen, or dried form).

191.    Conventional shell eggs are versatile and can be used in a wide range of culinary applications, including baking, frying, boiling, poaching, and scrambling. Because shell eggs are purchased fully intact, there are no limits to their culinary applications. Previously broken egg products like liquid eggs are often pre-mixed to combine the yolk and whites. By mixing the yolk and the whites, egg products' culinary applications are generally limited to making scrambled egg and the preparation of certain baked goods.

192.    Additionally, many egg consumers prefer the flavor and texture of freshly-cracked shell eggs over egg products. Egg buyers also value shell eggs because they generally do not contain additives, preservatives, or stabilizers, like egg products.

193.    "Conventional" shell eggs are differentiated from "specialty" shell eggs which include cage-free, organic, brown, free-range, pasture-raised, or nutritionally enhanced shell eggs. Conventional shell eggs make up the majority of shell eggs sold in the United States. In 2024, conventional shell eggs held almost three-quarters of the U.S. shell egg market, followed by cage-free eggs at about 23.2 percent, and pasture-raised at less than five percent.

194.    Accordingly, there are no reasonable substitutes for conventional shell eggs and they are a distinct product market.

**B.  The Relevant Geographic Market Is National**

195.    Should a geographic market need to be defined in this action, it is the United States. The Egg Producer Defendants produce and distribute eggs through locations across the United States and have increased egg prices nationwide.

## VI.   STATUTE OF LIMITATIONS AND TOLLING

196.    Plaintiff and members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this action.

197.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and members of the Class.

198.    Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2025, when news of the DOJ's investigation into egg prices broke.

199.    Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## VII.   CLASS ALLEGATIONS

200.    Plaintiff brings this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities who purchased shell eggs directly from one or more Egg Producer Defendant, or from any division, subsidiary, predecessor, agent, or affiliate of such Egg Producer Defendants, at any time during the period of January 1, 2022 ("Class Period") until Defendants' unlawful conduct and its anticompetitive effects cease to persist.

201.    The following persons and entities are excluded from the above-described proposed Class:

- Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

- All governmental entities;

- All Counsel of Record; and

- The Court, Court personnel, and any member of their immediate families.

202.    The Class is so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members because such information is presently in the exclusive control of Defendants. Plaintiff believes that due to the nature of the industry there are likely, at a minimum, hundreds of thousands of Class members in the United States and its territories.

203.    Common questions of law and fact exist as to all members of the Class. Plaintiff and the Class were injured by the same unlawful scheme, Defendants' anticompetitive conduct was generally applicable to all members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

- Whether Defendants exchanged competitively sensitive information;

- Whether Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize prices for eggs;

- The duration of the conspiracy alleged herein and the acts performed by Defendants and their Unnamed Co-conspirators in furtherance of the conspiracy;

- Whether such combination or conspiracy violated the federal antitrust laws;

- Whether the conduct of Defendants and their Unnamed Co-conspirators, as alleged in this complaint, caused injury to the Plaintiff and other members of the Class;

- Whether Defendants caused Plaintiff and the Class to suffer damages in the form of overcharges on eggs;

- The appropriate class-wide measure of damages; and

- The nature of appropriate injunctive relief to restore competition in the egg market.

204.   Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for eggs.

205.   Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

206.   Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

207.   The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

208.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual

members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

209.    Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

### VIII.  CAUSES OF ACTION

### COUNT 1

**Price Fixing in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**

210.    Plaintiff repeats the allegations set forth in Paragraphs 1-209, above, as if fully set forth herein.

211.    Beginning at a time currently unknown to Plaintiff, but at least as early as January, 1 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

212.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of eggs and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

213.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on eggs.

214.    Defendants' anticompetitive conduct had the following effects, among others:

- Competition among Defendants has been restrained or eliminated with respect to egg prices;

- The prices of eggs have been fixed, stabilized, or maintained at artificially high levels; and

- Plaintiff and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

215.    This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

216.    Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 2

### Information Exchange in Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)

217.    Plaintiff repeats the allegations set forth in Paragraphs 1-209, above, as if fully set forth herein.

218.    Beginning at a time currently unknown to Plaintiff, but at least as early as January, 1 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

219.     The contract, combination, or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

220.     Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on eggs.

221.     This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful *per se*. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

222.     Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 3

### Unjust Enrichment
### (Against All Egg Producer Defendants)

223.     Plaintiff repeats the allegations set forth in Paragraphs 1-209, above, as if fully set forth herein.

224.     Alternatively, from the acts of Defendants as alleged above, the Egg Producer Defendants have been unjustly enriched at the expense of Plaintiff and members of the Class.

225.     Through Defendants' systematic exchange of competitively sensitive non-public information, the Egg Producer Defendants have artificially increased the price of eggs paid by Plaintiff and members of the Class.

226.    The Egg Producer Defendants reaped from Plaintiff and members of the Class artificially high profits for eggs.

227.    The Egg Producer Defendants have been unjustly enriched by retaining the artificially high profits for eggs collected from Plaintiff and members of the Class.

228.    The retention of these profits by the Egg Producer Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiff and members of the Class.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully asks this Court for the following:

A.  The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Lead Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.  The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or rule of reason standard) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.  The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their

behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.   The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications;

E.   The Court grant Plaintiff and members of the Class all other equitable relief in the nature of disgorgement, restitution, and/or the creation of a constructive trust to remedy the Egg Producer Defendants' unjust enrichment;

F.   The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

G.   The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: November 6, 2025

Respectfully submitted,

/s/ *Irwin B. Levin*

Irwin B. Levin (Atty. No. 8786-49)
Scott D. Gilchrist (Atty. No. 16720-53)
Edward B. Mulligan V (Atty. No. 29400-53)
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481
ilevin@cohenandmalad.com
sgilchrist@cohenandmalad.com
nmulligan@cohenmalad.com

Gregory S. Asciolla*
Alexander E. Barnett*
Jonathan S. Crevier*
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
abarnett@dicellolevitt.com
jcrevier@dicellolevitt.com

David E. Kovel*
Thomas W. Elrod*
Lauren Wands*
James Isacks*
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
(212) 371-6600
dkovel@kmllp.com
telrod@kmllp.com
lwands@kmllp.com
jisacks@kmllp.com

Robert J. Gralewski, Jr.*
**KIRBY McINERNEY LLP**
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
(858) 834-2044
bgralewski@kmllp.com

Heidi M. Silton*
Jessica N. Servais*
Joseph C. Bourne*
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
(612) 339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com

*To seek *Pro Hac Vice* admission          ***Attorneys for Plaintiff and the Proposed Class***